**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


**KITTY PITTMAN,**

      **Plaintiff,**

                                         **Civil Action 2:12-cv-980**

      **v.**                               **Magistrate Judge Elizabeth P. Deavers**


**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**


**<u>OPINION AND ORDER</u>**

Plaintiff, Kitty Pittman, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits under Title II of the Social Security Act.  This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 17), and the administrative record (ECF No. 9).  For the reasons that follow, the Court **REVERSES** the Commissioner of Social Security's nondisability finding and **REMANDS** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

# I.  BACKGROUND

Plaintiff filed her applications for benefits on February 10, 2010, alleging that she has been disabled since September 1, 2009, at age 47.[1]  (R. at 132-42.)  Plaintiff alleges disability as a result of multiple compression fractures of the spine; arthritis of hip/knee; mild traumatic brain injury and migraines related to same; depression; insomnia; and chronic pain of the back and leg. (R. at 173.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Ken B. Terry ("ALJ") held a video hearing on November 29, 2010, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 47-69.)  George W. Coleman III, a vocational expert ("VE"), also appeared and testified at the hearing.  (R. at 70-77.)  On July 7, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 11-22.)  On September 5, 2012, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-5.)  Plaintiff then timely commenced the instant action.

# II.  HEARING TESTIMONY

## A.     Plaintiff's Testimony

At the June 13, 2011 hearing, Plaintiff testified that her most severe impairment is the compression fractures and degenerative spine issues attributable to a vehicle accident in December 1992.  (R. at 47.)  She described her neck and back pain as constant "stabbing pain."

---

[1]Plaintiff originally filed for both social security disability insurance benefits and supplemental security income.  Her supplemental security income claim was denied due to Plaintiff's resources exceeding the minimum amount.  (R. at 29-34.)  Plaintiff has not appealed this decision such that it is not subject to judicial review.

(*Id.*)  She testified that on an average day, utilizing a ten-point scale, she experiences pain at a level eight.  (R. at 50.)  Cold weather exacerbates her pain, increasing it to a level where she considers reporting to a hospital.  (*Id.*)  Plaintiff elaborated that she has "bad days" approximately three days per week.  (R. at 51.)  She indicated that on these "bad days" she can barely function.  (R. at 51-52.)

Plaintiff estimated that she could sit for approximately one hour, but that she would need to "change position a lot."  (R. at 50.)  She further estimated that she could stand for only twenty minutes and walk for fifteen to twenty minutes.  (R. at 50-51.)  Plaintiff testified that her primary care physician, Dr. Cronau, referred her for an x-ray when she started experiencing increased pain in her neck and numbness in her right arm.  She indicated that she has dropped things when her arm was numb, but that she ordinarily does not use her arm when it numb.  (R. at 52-53.)

In terms of treatment for her pain, Plaintiff testified that she takes the following medications:  Hydrocodone, Tramadol, and Flexeril.  (R. at 47-48.)  She indicated that she has taken pain medication since the accident, which was approximately nineteen years prior to the hearing.  (R. at 48.)  She stated that she utilized a TENS unit for trial period, but found it was not effective.  (R. at 49.)  She also indicated that she attended a pain clinic at Ohio State University for three weeks to help her live to learn with her pain.  (R. at 68.)  Plaintiff testified that there were periods in her medical history the reflected little treatment because she was uninsured.  (R. at 53-54.)

With regard to her mental health problems, Plaintiff testified that he has taken anti-depressant medication "off and on" since the 1992 vehicle accident.  (R. at 55.)  At the time of the hearing, Plaintiff was taking Prozac.  (*Id.*)  She indicated that she has crying spells two to

3

three times a week and cried every day when she was working due to pain.  (R. at 54-55.)  She indicated that while employed, she and her supervisor had a disagreement over how much she could lift, which caused her to cry and resign.  (*Id*.)  She estimated that she would miss one day per week while employed at her last job due to her pain.  (R. at 55.)  Plaintiff testified that she does not feel like getting dressed due to depression approximately two or three times per week. (R. at 57.)

Plaintiff indicated that her husband does most of the laundry, vacuuming, mopping, sweeping, and shower-scrubbing.  (R. at 57, 63.)  She added that she cannot do laundry because she cannot carry the baskets, cannot vacuum because the vacuum cleaner is too heavy, and can no longer work in her flower gardens due to her pain.  (*Id*.)  Plaintiff indicated that she does "a little bit of cleaning" for a couple minutes at a time, including folding clothes, loading the dishwasher, and dusting.  (R. at 52, 63.)  She further indicated that she does some cooking in the oven rather than the stove so she does not have to stand.  Plaintiff stated that she and her husband stay at home all the time.  (R. at 65.)

Plaintiff testified that her doctors have told her that her condition is getting worse.  (R. at 57-58.)  She testified that after years of struggling with low back pain, Dr. Cronau told her to "stop fighting it" and to "stop working."  (R. at 58.)  She said that doctors have told her "there was nothing they could do" for her pain.  (R. at 65-66.)  She has never received spinal steroid injections and has not undergone surgery.  (R. 66.)

## B.    Vocational Expert Testimony

George W. Coleman III, testified as the vocational expert ("VE") at the administrative hearing.  (R. at 70-77.)  He identified Plaintiff's past work as a picker or a packer, a bonding

4

machine operator, and a childcare provider, all of which he classified at the medium and unskilled exertional level; and a house cleaner and machine operator assembler, both of which he classified at the light and unskilled level.  (R. at 70-71.)

Based on Plaintiff's age, education, work experience, and the limitations the ALJ set forth, the VE testified that Plaintiff could perform her past relevant work as a house cleaner and an assembler.  (R. at 71-72.)  In responding to various hypotheticals posed by the ALJ based upon Plaintiff's residual functional capacity, the VE also testified that Plaintiff could perform a significant number of jobs at the light exertional level, including positions such as a storage facility rental clerk, routing clerk, and fast food worker, as well as a significant number of jobs at the sedentary level, including a telephone information clerk, food and beverage order clerk, and charge account clerk.  (R. at 72-74.)  The VE further testified that competitive employment would be precluded upon incorporation of the limitations Plaintiff's endorsed in her testimony, namely that she could not stand and/or walk a total of even two hours per eight-hour day.  (R. at 75.)  The VE added competitive employment would also be precluded if the individual needed to be off task for an hour and a half to two hours per day (or 20 percent of the day).  (R. at 75-76.)  Finally, the VE testified that the limitations Dr. Cranau found would be work preclusive.  (R. at 76-77.)

### III.   MEDICAL RECORDS

**A.      Pre-Onset Records**

In December 1992, Plaintiff was involved in a motor vehicle accident in which she sustained multiple injuries, including head trauma, a right femoral fracture, thoracic spine fractures, and a right subtrochanteric hip fracture that required open reduction internal fixation.

(R. at 216-76.)  Due to persistent problems with the hip fixation, Plaintiff underwent removal of

the right hip hardware in December 1994.  (R. at 229-30.)

In July 1994, Paul E. Kaplan, M.D., a pain management specialist, examined Plaintiff in

connection with her complaints of pain.  Upon physical examination, Dr. Kaplan noted that

Plaintiff was "very limber and has minimal pain behavior."  (R. at 284.)  Her

neuromusculoskeletal exam revealed that she was normal and healthy.  (*Id*.)  Dr. Kaplan

concluded that Plaintiff's "only lasting effects of the injury [from the 1992 vehicle accident] are

the scars from her surgeries, particularly that in her right hip, with a plate being placed in this

area."  (*Id*.)  He diagnosed Plaintiff with a pain disorder associated with medical and

psychological factors and recommended that she attend a chronic pain management program.

(R. at 284.)  In April 1995, Dr. Kaplan reported that Plaintiff had attended the pain management

program and that a full neuromusculoskeletal exam revealed no functional abnormalities.  He

reported that "it was recognized that [Plaintiff's] psychosocial dysfunction was quite great and

would need a great deal of intensive care with psychological therapy as well as the usual

program."  (*Id*.)  Dr. Kaplan reported that Plaintiff had made a great deal of progress in the first

two weeks of the program until a couple of the psychosocial topics stressed her such that she did

not fully participate the third and final week of the program.  (R. at 283.)  He indicated that "[a]s

a result, [Plaintiff] will be discharged and followed through the rehab psychology division with

additional psychosocial aid and counseling for her problems, which were severe."  (*Id*.)  Dr.

Kaplan also drafted a letter directed to "To Whom It May Concern" in which he indicated that

Plaintiff's 1992 vehicle accident resulted in mild brain damage, with increased distractibility and

emotional lability; and chronic pain syndrome of the neck, shoulders, and back.  He opined that

6

Plaintiff was not capable of performing even sedentary occupations due to problems with concentration and pain that affected all of her extremities. (R. at 281.)

Plaintiff presented to the emergency room in March 2007 with complaints of neck and back pain. (R. at 301-04.) An x-ray of Plaintiff's thoracic spine revealed multiple chronic thoracic vertebral compressions, with the greatest compression at T8 and T12. (R. at 302.) The thoracic spine x-ray also revealed "moderately severe chronic degenerative spurring anteriorly." (*Id*.) The cervical spine x-ray revealed degenerative spurring at C3-C6 resulting in mild compromise of the neural foramen across these levels. (R. at 303.) The lumbar spine x-ray showed degenerative spurring anteriorly in the upper lumbar spine and "mild sclerosis as chronic degenerative change in the posterior elements of L4-S1." (R. at 304.)

**B.      Holly R. Cronau, M.D./OSU Family Practice**

The record before the ALJ contained treatment notes from Dr. Cronau, Plaintiff's primary care physician, reflecting that Dr. Cronau treated Plaintiff since at least April 1997 through March 2011. (R. at 320-47, 357-64, 366-87.) Dr. Cronau treated Plaintiff for chronic back pain and depression. (*Id.*)

In December 2007, Dr. Cronau noted that Plaintiff chronic back pain was "stable most days," that Plaintiff was able to enjoy vacation, but that she "need[ed] to frequently move" so that her back did not become stiff or sore. Dr. Cronau from Ohio State University ("OSU") Family Practice also noted that Plaintiff was experiencing elbow pain and numbness in two fingers. She prescribed mediation to treat Plaintiff's pain and depression. (R. at 321.)

In May and December 2008, Plaintiff reported to Dr. Cronau that her thoracic and lower back pain had been waxing and waning since her accident. (R. at 341-44.) Plaintiff's pain

worsened by twisting and bending and was worse during the day with use. (*Id.*) On examination, Dr. Cronau noted that Plaintiff exhibited paraspinal tenderness at the lumbar spine and bony tenderness (mild tenderness at thoracic spine) and spasm. In May 2008, Dr. Cronau noted that Plaintiff exhibited tenderness upon physical examination, had tight muscles, and muscle spasms. (R. at 344.) Similarly, in December 2008, Dr. Cronau noted that Plaintiff's "muscles are very spastic-L/S area!!." (*Id*. at 342.) During both the May and December 2008 examinations, Plaintiff exhibited normal range of motion, no swelling and no edema; good range of motion of her neck; normal strength and normal reflexes; no weakness; a normal straight leg raise test; and normal gait. Plaintiff was prescribed hydrocodone-acetaminophen and metaxalone for her compression fracture. (R. at 341-44.)

In January 2010, Plaintiff indicated that her pain had increased such that she had to quit her job. (R. at 339-40.) Plaintiff described her pain as stabbing, burning, and aching radiating into her shoulders and right arm. (*Id.*) She now was experiencing numbness and pain in her right arm and experienced difficulty holding a coffee cup. (*Id.*) Neurological system review was positive for tingling in the right arm and right leg shooting into the right foot. (*Id.*) Dr. Cronau's physical exam revealed that Plaintiff exhibited a normal range of motion and normal strength and reflexes, but that she exhibited tenderness upon palpation in her upper thoracic spine. (*Id.*) Dr. Cronau noted that Plaintiff had continued to experience significant pain. She also noted that Plaintiff had experienced "some relief" with medication, but that Plaintiff did not presently have insurance. (*Id.*) Dr. Cronau listed Plaintiff's diagnosis as degenerative joint disease, and she prescribed pain medication. (*Id*. at 340.)

On July 15, 2010, Plaintiff complained of pain and numbness in the right arm that interfered with her daily activities.  She could not lift groceries or laundry.  (R. at 357-58.) Plaintiff also reported trouble sleeping and was waking every two hours due to pain.  (*Id.*) Plaintiff reported that her anxiety and depression symptoms were getting worse.  She described feeling depressed, hopeless and tired, little energy, showed little interest or pleasure in doing things, had difficulty concentrating, falling and staying asleep and worry.  (*Id.*)  Dr. Cronau found Plaintiff to be have decreased concentration, decreased mood, more anger, and observed her to be more anxious and "in pain."  (*Id.*)  She had decreased ranges of motion in her shoulders, exhibited tenderness in the upper thoracic spine and lower cervical spine, had paraspinal muscle spasms in the thoracic and lumbar spine areas and noted pain to palpation around C7.  (*Id.*)  Plaintiff exhibited normal strength and reflexes.  Dr. Cronau's diagnosed degenerative joint disease and depressive disorder.  (*Id.*)

On July 15, 2010, Dr. Cronau completed a medical source statement regarding Plaintiff's physical capacity.  (R. at 354-55.)  Dr. Cronau opined that Plaintiff could occasionally lift and/or carry a maximum of 8 pounds, could stand and/or walk for a total of 3 hours in an 8-hour workday for 30 minutes at a time, and could sit for a total of 8 hours in an 8-hour workday for 30 minutes without interruption.  Dr. Cronau also found that Plaintiff could rarely climb, stoop, crouch, kneel, crawl, push/pull and perform gross manipulation and could occasionally balance, reach, handle, feel, and perform fine manipulation.  (*Id.*)  Dr. Cronau further opined that Plaintiff would need breaks throughout the day at two-hour intervals, would need an at-will sit/stand option, and was experiencing severe pain.  (R. at 355.)  Dr. Cronau did

not complete provide a narrative description identifying the medical findings that supported her assessment.  (R. at 354.)

Dr. Cronau also completed a medical source statement regarding Plaintiff's mental capacity on July 15, 2010.[2]  (R. at 213-14.)  Dr. Cronau opined that Plaintiff had a fair ability to do the following: respond appropriately to changes in routine settings; relate to co-workers; function independently without special supervision; understand, remember and carry out detailed and simple job instructions; maintain appearance; socialize; manage funds/schedules; and leave home on her own.  (*Id.*)  Dr. Cronau also opined that Plaintiff had a poor ability to do the following: maintain attention and concentration for extend periods of two-hour segments; maintain regular attendance and be punctual within customary tolerances; deal with the public; interact with supervisor(s); work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stresses; complete a normal workday and work week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry our complex job instructions; behave in an emotionally stable manner; and relate predictably in social situations.  (*Id.*)  Dr. Cronau did not provide medical or clinical findings to support her assessment.  (R. at 214.)

In March 2011, Plaintiff complained of right-sided knee, hip, and arm pain interfering with her ability to perform daily activities for more than a few minutes at a time.  (R. at 362-63.) She could not perform daily activities without pain medication.  (*Id.*)  On examination, Dr.

---

[2]Even though the date appears on the form to read "7-15-90," in looking at the date of revision on the form as well as the July 23, 2010 date this was sent to the administration, (R. at 215), it is apparent that Dr. Cronau's inadvertently wrote "90" instead of "10," such that the date of the assessment is July 15, 2010.

Cronau found good range of motion of the knees, but some painful movement of the right hip; tenderness on the upper thoracic spine and lower cervical spine; normal range of motion of the lumbar spine without tenderness, swelling or edema; normal strength and normal reflexes; no weakness; normal straight leg raises; and her patellar reflexes on the right and left were within normal limits. Plaintiff's mental symptoms included decreased concentration and mood and increased worry, frustration, and anger. (*Id.*) Dr. Cronau listed her diagnoses as degenerative disc disease and depressive disorder. (*Id*. at 363, 486-87.)

## C.    State Agency Evaluations

On April 12, 2010, state reviewing physician Dr. Hill reviewed the record as to Plaintiff's physical impairments and assessed that there was insufficient evidence prior to her date last insured to make a medical decision regarding Plaintiff's work related function. (R. at 351.) He noted that Plaintiff's allegations of a past injury were credible and that "she may have pain from this," but that "[f]urther assessment of degree of credibility of specific limitation is not possible" given the lack of record evidence. (*Id*.) Eli Perencevich, D.O., reviewed the record on July 1, 2010 and affirmed the March 25, 2010 assessment. (R. at 353.) Drs. Hill and Perencevich conducted their analysis under the mistaken assumption that Plaintiff's claimed onset date was her date last insured.

Paul Tangeman, Ph.D., a state-agency psychologist, assessed Plaintiff's mental condition on March 25, 2010. (R. at 306-19.) Dr. Tangeman found no mental health treatment in the file. He noted Plaintiff's allegations of depression, insomnia, crying spells, mood swings, and irritability. He concluded that insufficient evidence prior to Plaintiff's date last insured precluded him from making a determination. (R. at 318.) On June 28, 2010, state-agency

psychologist William Benninger, Ph.D., affirmed Dr. Tangeman's April 12, 2010 assessment. (R. at 352.)  Like Drs. Hill and Perencevich, Drs. Tangeman and Benninger conducted their analysis under the mistaken assumption that Plaintiff's claimed onset date was her date last insured.

**D.     New Evidence**

Plaintiff indicates that she submitted additional evidence to the Appeals Council following the ALJ's decision.  (R. at 4.)  The additional evidence consists of records from The Ohio State University Medical Center dated from MaMarch 4, 2014rch 2011 through March 2012.  (R. at 388-523.)

According to these records, on April 26, 2011, Plaintiff complained of worsening right arm numbness and weakness.  (R. at 481-82.)  Dr. Cronau found she had pain with cervical range of motion testing and on palpation.  (*Id.*)  A cervical spine x-ray taken the same day revealed degenerative disc disease at C3-4, C4-5 and C5-6 and mild to moderate neural foraminal narrowing bilaterally, greater on the right.  (R. at 509-10.)

In October 2011, Plaintiff continued to complain of pain.  (R. at 475.)  On examination, Dr. Cronau noted tenderness on Plaintiff's upper thoracic spine and lower cervical spine and that her paraspinal muscles were in spasm in the thoracic and lumbar spine area.  (*Id*.)

In December 2011, Plaintiff presented to Dr. Granger at the Orthapaedics Carepoint department at The Ohio State University Medical Center with complaints of hip and back pain. Examination revealed good range of motion of her knee and that her hip was "supple and pain-free with flexion-extension."  (R. at 393.)  Plaintiff was "able to get up and down from the exam table and change positions without any significant pain or discomfort" and was able to bend

12

forward with limited pain.  (*Id.*)  X-rays revealed "minimal degenerative changes with slight joint space narrowing superiorly."  (*Id.*)  Dr. Granger was "unable to identify any cause for [Plaintiff's] chronic [hip and lower extremity] pain" and added that "she retain[ed] good function and movement of her extremities . . . ."  (*Id.*)  Dr. Granger advised that Plaintiff "continue to remain as active as possible" and suggested referral for evaluation of her back and neck pain. (*Id.*)

A cervical spine MRI taken in January 2012 revealed multi-level degenerative disc disease most pronounced at C4-5 and C5-6, with posterior disc osteophyte complexes resulting in spinal stenosis and neural foraminal narrowing more pronounced on the right.  (R. at 397-99.) The MRI of the thoracic spine revealed "remote compression fractures at T6-T8, T11 and T12," as well "numerous left-sided rib fractures."  (R. at 409.)  Dr. Nguyen, who Plaintiff saw for chronic pain, diagnosed Plaintiff with compression fractures, thoracic spondylosis without myelopathy, chronic musculoskeletal pain, thoracic faucet syndrome, cervical degenerative disc disease, and lumbar degenerative disc disease.  (R. at 423-25.)  Dr. Nguyen recommended that Plaintiff schedule thoracic facet injections.  (R. at 427.)

In February 2012, Dr. Cronau indicated that Plaintiff had reported that her neck pain was stable and that she had been receiving spinal injections.  Plaintiff also reported that with the pain medication, she was able to complete her activities of daily living if she paced herself by doing a chore every fifteen minutes.  (R. at 451.)  Plaintiff reported pain and tingling in her right leg. Upon physical exam, Dr. Cronau noted that Plaintiff exhibited tenderness in her thoracic and lower cervical spine, and she observed spasms in Plaintiff's paraspinal muscles of her lumbar spine and thoracic area, decreased range of motion.  (R. at 452.)

13

In March 2012, Dr. Nguyen reported that the medial branch block injections Plaintiff had received were not effective in relieving her pain.  He listed her "active problem[s]" as compression fracture, thoracic spondylosis without myelopathy, and cervical radiculitis, and her diagnoses as chronic musculoskeletal pain, thoracic faucet syndrome, cervical degenerative disc disease, and lumbar degenerative disc disease.  (R. at 470–72.)

## IV.   THE ADMINISTRATIVE DECISION

On July 7, 2011, the ALJ issued his decision.  (R. at 11-22.)  The ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2014. (R. at 13.)  At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged onset date of September 30, 2009. (*Id.*)  At step two, the ALJ found that Plaintiff had the severe impairments of mild degenerative disc disease of the cervical spine, degenerative joint disease of the hip, a history of disc compression of the thoracic spine, depression, and anxiety.  (*Id.*)  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (*Id.*)  At step four of the sequential process, the ALJ evaluated Plaintiff's residual

functional capacity ("RFC").  The ALJ found that Plaintiff had the following RFC:

> After careful consideration of the entire record, [the ALJ] find[s] that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant can lift and/or carry and push and/or pull a maximum of 20 pounds occasionally and 10 pounds frequently; sit for four hours at a time and a total of eight hours during an eight hour work day; and walk and/or stand for up to two hours at a time and a total of six hours during an eight hour work day. The claimant is precluded from climbing ropes/ladders/scaffolds, but can occasionally climb ramps/stairs. The claimant can perform occasional balancing, stooping, kneeling, crouching and crawling. The claimant has no significant manipulative limitations. The claimant has no visual, communicative, or environmental limitations.  Mentally, the claimant is limited to simple, unskilled, repetitive tasks.

(R. at 15.)  In reaching this determination, the ALJ stated that his assessment was supported by

the objective medical and other credible evidence of record including treatment records and the

opinion evidence in the record, along with Plaintiff's acknowledged activities.  (R. at 20.)  The

ALJ gave "little" weight to the two opinions offered by Dr. Cronau; Dr. Kaplan's opinion; and

the state-agency opinions of Drs. Hill and Perencevich.  (R. at 19.)  The ALJ assigned "some"

weight to the state agency psychological assessments of Drs. Tangeman and Benninger.  (R. at

20.)

The ALJ further noted that Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms.  He concluded, however, that Plaintiff's

statements concerning the intensity, persistence, and limiting effects of these symptoms are not

credible to the extent they are inconsistent with the above residual functional capacity

assessment.  (R. at 20.)

15

Relying on the VE's testimony, the ALJ determined that Plaintiff is capable of performing her past relevant work as a house cleaner and an assembler.  (R. at 20.)  The ALJ made an alternative finding at step five, finding other jobs existing in the national economy that Plaintiff can perform.  (R. at 21-22.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 22.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v.*

16

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   LEGAL ANALYSIS

In her Statement of Errors, Plaintiff asserts that substantial evidence fails to support the ALJ's RFC finding.  Within this contention of error, Plaintiff contends that the bases for the ALJ's RFC finding are unclear and that the ALJ did not give proper weight to her treating physician, Dr. Cronau.  Plaintiff also argues that there is new evidence that was not available at the time of her hearing that accounts for her subjective complaints of disabling pain.  The Court agrees with Plaintiff that substantial evidence does not support the ALJ's RFC assessment.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).  Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).  When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v.*

*Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).  An ALJ, however, "does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding."  *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

With regard to Plaintiff's physical impairments, the ALJ agreed that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," primarily, chronic debilitating pain that is exacerbated during certain activities.  (R. at 20.)  State-agency reviewing physicians Drs. Hill and Perencevich similarly found that Plaintiff's allegations of her past injury were credible and that "she may have pain from this," but they determined that the lack of record evidence precluded them from assessing the degree of specific limitation.  (R. at 351.)  As noted above, however, Drs. Hill and Perencevich conducted

18

their analysis under the mistaken assumption that Plaintiff's claimed onset date was her date last insured such that they only considered evidence *prior* to her alleged onset. Thus, the ALJ properly accorded their opinions "little weight." (R. at 19.) Dr. Cronau, Plaintiff's treating physician, agreed that Plaintiff's physical impairments affected her ability to perform various activities as reflected on her July 2010 RFC assessment. The ALJ, however, rejected Dr. Cronau's opinion regarding Plaintiff's physical limitations. The ALJ therefore arrived at his RFC findings without the assistance of a medical source.

Plaintiff takes issue with the ALJ's RFC determination that she can perform light work in the absence of any medical-source opinions supporting this finding. Plaintiff posits that "[a]bsent any relevant state agency consultant opinions and having improperly dismissed Dr. Cronau's opinions, there simply is not substantial evidence to support the ALJ's residual functional capacity finding." (Pl.'s Statement of Errors 17, ECF No. 12.) This particular argument lacks merit. As set forth above, the ALJ is ultimately charged with evaluating the medical evidence and determining a claimant's RFC. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e). The United States Court of Appeal for the Sixth Circuit recently considered and rejected this very argument, reasoning as follows:

> Next, [Plaintiff] contends that the ALJ's RFC is not supported by substantial evidence because no physician opined that [Plaintiff] was able to perform the standing and walking requirements of light work. As we have mentioned, the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence. As the Commissioner points out, the Commissioner has final responsibility for deciding an individual's RFC, SSR 96–5p, 1996 WL 374183 (July 2, 1996), and to require the ALJ to base her RFC finding on a physician's opinion, "would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Id*. This argument is rejected.

19

*Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).  Here, there is no evidence that the ALJ impermissibly interpreted raw medical data in connection with the RFC formulation.  Thus, the fact the ALJ did not rely on a medical source in determining Plaintiff's RFC does not constitute a basis for remand.

The ALJ did, however, commit a number of errors in his consideration of the medical and non-medical evidence such that the Court cannot conclude that substantial evidence supports his RFC formulation and nondisability finding.  More specifically, the ALJ misstated some important evidence, misunderstood the importance of certain evidence, and improperly failed to consider other evidence.  For example, in evaluating Dr. Cronau's opinion and Plaintiff's credibility, the ALJ found "[m]ost notable . . . the obvious lack of objective medical tests and the lack of significant treatment."  (R. at 17.)  Indeed, the ALJ's heavy reliance on Plaintiff's lack of treatment and the absence of treatment records is reflected throughout his opinion:

> Despite her allegations of a disabling back impairment, the record contains no more than three x-rays.  There are no MRIs. . . .  [T]he lack of treatment indicates that the claimant's condition is not as severe as she alleges. . . .  I find that if the claimant's condition were as limiting as she alleges[,] the record would contain evidence of more significant treatment.  As a result, I find the claimant is capable of a significant range of light work. . . .  I find that if the claimant's mental condition were as limited as she alleges, the record would contain evidence of more significant mental health treatment .  . . .  [T]he record contains no objective medical tests or significant treatment contemporaneous to her alleged onset date. . . .  [T]he record contains no evidence of any treatment for a mental impairment other than the single mention of depression and anxiety in 2010.  . . .  These opinions [of Drs. Benninger and Tangeman] are consistent with the lack of treatment records.

(R. at 17–20.)  Although "a failure to seek treatment may be considered as evidence against a finding of disability, SSR 96-79 requires the adjudicator to consider any reasons offered for that failure, including mental illness or lack of insurance."  *Ross v. Comm'r of Soc. Sec.*, No. 3:13-cv-20, 2013 WL 6001936, at *9 n.7 (S.D. Ohio Nov. 12, 2013) (citations omitted); *see also Pierce*

*v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (concluding that "the ALJ inappropriately rested his credibility determination too heavily on the absence of objective support for [the claimant's] complaints [of pain]," which "was particularly erroneous because the ALJ knew that [the claimant's] lack of insurance prevented her from seeking medical attention and thus could explain her lack of objectively quantifiable test results"). Here, when the ALJ asked Plaintiff why there were periods in her medial history when she was not getting treatment, she testified that she was uninsured during those periods. (R. at 53-54.) Consistently, in January 2010, Dr. Cronau prescribed pain medication and noted that Plaintiff had experienced "some relief" with medication, but added that Plaintiff did not presently have insurance. (R. at 339-40.) Yet the ALJ fails to mention, let alone consider, Plaintiff's proffered justification for the absence of treatment during periods of her medical history.

The ALJ's reliance on Plaintiff's testimony concerning her activities of daily living as proof of her ability to perform light work is likewise flawed. In concluding that his RFC determination was "supported by . . . the claimant's acknowledged activities" (R. at 20), the ALJ reasoned as follows:

> Further, the claimant has acknowledged engaging in activities that are inconsistent with a total inability to work. The claimant lives in a one-story modular home with her husband. She testified that her husband does the laundry, but she folds it. She is independent for her personal care and hygiene. She testified that during commercial breaks, she does light household cleaning. She does the dishes and dusts. She cooks simple meals. She enjoys painting and making crafts occasionally. She grocery shops and she testified that she selects items off the shelves and loads them into the card. In sum, the claimant's acknowledged activities are inconsistent with an individual who is incapable of performing work related activities on a regular and sustained basis.

(R. at 18.) Plaintiff's testimony, however, does not support the ALJ's finding. As set forth above, Plaintiff testified that her husband does most of the household chores and that she does "a

21

little bit of cleaning" for a couple minutes at a time, including folding clothes, loading the

dishwasher, and dusting.  (R. at 52, 57, 63.)  Consistently, in March 2011, Plaintiff reported to

Dr. Cronau that her pain prevented her from performing daily activities for more than a few

minutes at a time.  (R. at 362-63.)  As this Court recently explained, "an RFC is not determined

in light of what a claimant might be able to unreliably or intermittently accomplish, but serves as

a measure of the claimant's capability for sustained work activity."  *Ross*, 2013 WL 6001936 at

\*9 (citing 20 C.F.R. § 416.945(b)); *see also Gabbard v. Comm'r of Soc. Sec.*, No. 3:11-cv-426,

2012 WL 5378747, at \*14 (S.D. Ohio Oct. 30, 2012) ("[T]he ability to perform intermittent and

interrupted daily functions such as driving, grocery shopping, or chores, is not evidence of an

ability to perform substantial gainful activity." (citing *Walston v. Gardner*, 381 F.2d 586–87 (6th

Cir. 1967)).  Here, there is no record evidence illustrating that Plaintiff performed the activities

consistently and without substantial interference from pain.

　　　The ALJ's reliance upon Plaintiff's testimony to discount Dr. Cronau's opinion that

Plaintiff would require unscheduled work breaks during the work day and that she can only sit

for thirty minutes without interruption was also erroneous.  The ALJ fails to explain how

Plaintiff's testimony is inconsistent with Dr. Cronau's opinion concerning work breaks, and the

Court can discern no bases.  The ALJ did, however, offer an the following explanation for his

finding regarding Plaintiff's capacity to sit without interruption: "Dr. Cronau opined that the

claimant could not sit for even 30 minutes, however the claimant testified that she could sit for

over an hour."  (R. at 19.)  This reasoning reflects that the ALJ's has either misunderstood or

mischaracterized Plaintiff's testimony.  As set forth above, Plaintiff testified that she could sit

for approximately one hour, but that she would need to "change position a lot."  (R. at 50.)  This

testimony does not necessarily contravene Dr. Cronau's opinion.  Regardless, the ALJ ultimately determined that Plaintiff retained the functional capacity to "sit for four hours at a time," without any support or explanation for this finding.

The ALJ also committed a number of errors in his evaluation of record evidence relating to Plaintiff's mental impairments.  First, he incorrectly states that the record contained only one mention of treatment for mental impairments in July 2010.  Rather, the record reflects treatment for mental impairments in 2007, 2010, and 2011.  (R. at 321, 324, 357-58, 362-63, 486-87.)  Further, in 2010, Dr. Cronau indicated that the onset of Plaintiff's symptoms of anxiety and depression "was several year[s] ago, clinical course gradually worsening since that time."  (R. at 357.)  The ALJ also disregarded Dr. Cronau's medical source statement regarding Plaintiff's mental capacity simply because he was "unable to ascertain the date of [the] opinion."  (R. at 19.)  As set forth above, review of the date of revision on the assessment form as well as the July 23, 2010 date the assessment was sent to the administration makes clear that Dr. Cronau inadvertently dated the form as July 15, 1990, instead of July 15, 2010, which, significantly, is the same date she completed a medical source statement regarding Plaintiff's physical capacity.  Finally, the ALJ accorded "some weight" to the opinions of state-agency psychologists Drs. Tangeman and Benninger even though their opinions related to an irrelevant period given that they conducted their analysis under the mistaken assumption that Plaintiff's claimed onset date was her date last insured.  (R. at 20.)  Further, this Court cannot discern how these opinions could have influenced the ALJ's RFC calculation given that Drs. Tangeman and Benninger declined to make determinations based upon the medical record available to them.  (R. at 318, 352.)

In sum, in weighing the evidence to formulate Plaintiff's RFC, the ALJ failed to consider portions of the record and misunderstood or mischaracterized the significance of other evidence in the record.  Remand is therefore appropriate.  This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error.  Thus, the Court need not, and does not, resolve the alternative bases Plaintiff asserts support reversal and remand.

## VII.  DISPOSITION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g).  Accordingly, the Court **REVERSES** the Commissioner of Social Security's nondisability finding and **REMANDS** this case to the Commissioner under Sentence Four of § 405(g) for further consideration consistent with this Opinion and Order.

**IT IS SO ORDERED.**

Date: March 4, 2014            _/s/ *Elizabeth A. Preston Deavers*_
                                        Elizabeth A. Preston Deavers
                                        United States Magistrate Judge

24